```
                                                          Page 1
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF VIRGINIA

 3

 4   THE COLEMAN COMPANY, INC.,    )
                                   )
 5              Plaintiff,         )
                                   )
 6        vs.                      ) No. 2:2020cv00351
                                   )
 7   TEAM WORLDWIDE CORPORATION,   )
                                   )
 8              Defendant.         )
     _____)
 9

10

11

12      VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

13                   GLEN STEVICK, PhD

14               FRIDAY, AUGUST 20, 2021

15

16

17

18

19

20

21

22   REPORTED BY:

23   MARLA SHARP, RPR, CLR, CCRR, CA CSR 11924,

24   OR CSR 17-0446, UT CSR 11917368-7801

25   JOB NO. 198265
```

1

2

3

4

5                         August 20, 2021

6                         9:02 a.m. PDT

7

8

9         Video-recorded videoconference

10   deposition of GLEN STEVICK, PhD, held

11   remotely via Zoom pursuant to agreement

12   before Marla Sharp, a stenographic

13   reporter certified in California,

14   Oregon, and Washington.

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                    FRIDAY, AUGUST 20, 2021

2                         9:02 A.M. PDT

3            THE VIDEOGRAPHER:  We are now on the

4   record.  The time is 9:02 a.m.

5            This is the video-recorded deposition of

6   Glen Stevick, PhD, on August 20th, 2021, in the

7   matter of Coleman Company -- The Coleman Company

8   Inc. versus Team Worldwide Corporation in the United

9   States District Court, Eastern District of Virginia,

10  Case No. 2:2020cv00351.

11           My name is Vladimir Korneychuk,

12  videographer with TSG Reporting.  The court reporter

13  is Marla Sharp, also with TSG Reporting.

14           Due to the severity of the COVID-19 and

15  following the practice of social distancing, I will

16  not be in the same room with the witness.  Instead,

17  I will record this videotaped deposition remotely.

18           The court reporter also will not be in the

19  same room and will swear the witness remotely.

20           Counsel will now state their appearances

21  for the record and stipulate to the validity of this

22  remote video recording and remote swearing.

23           MR. HARBIN:  John Harbin with Meunier

24  Carlin & Curfman representing The Coleman Company.

25  With me is Lee Hamilton.

Page 8

```
 1         MR. HARKINS:  And Robert Harkins of
 2  RuyakCherian LLP for Team Worldwide and the
 3  deponent.
 4         THE VIDEOGRAPHER:  Thank you.
 5         Would the court reporter please swear in
 6  the witness.
 7                  GLEN STEVICK, PhD,
 8       called as a witness, having been duly
 9       sworn by the certified shorthand
10       reporter, was examined and testified as
11       follows:
12         THE COURT REPORTER:  Thank you.
13         Counsel, please proceed.
14                    EXAMINATION
15  BY MR. HARBIN:
16     Q   Dr. Stevick, would you state your full
17  name, please.
18     A   Sure.  It's Glen Stevick.
19     Q   Okay.  And we have met before.  But, for
20  the record, I'm John Harbin.  I'll be asking you
21  some questions about background -- your opinions and
22  background information.
23         You've given depositions before, correct?
24     A   Yes, sir.
25     Q   Can you approximate how many times you've
```

Page 190

1  construction?

2      A      I would think so.

3      Q      So an accused device can have components
4  that -- beyond what is listed in the remainder of
5  the complaint -- remainder of the claim after a
6  "comprising" term and the claim can still be
7  infringed, right?

8      A      Sure.

9      Q      Okay.  Is it correct that the accused
10 products have coils from top -- from the top panel
11 to the bottom panel even though, in your view, there
12 are multiple chambers in the accused products?

13             MR. HARKINS:  Objection.  Form.

14             THE WITNESS:  They certainly have coils or
15 tension members or stays from the top to the bottom
16 surface and also to the partition.

17 BY MR. HARBIN:

18     Q      Okay.  And is it correct that the side
19 support beams in the accused products have holes to
20 let air through?

21     A      Well, the partition does.

22     Q      Well, the -- if you look at paragraph 36 of
23 your report -- actually, start at paragraph 35.

24     A      Mm-hmm.  Yes.

25     Q      You're addressing Dr. Singhose's opinion.

Page 234

1    Q    Okay.  So in the picture under
2  paragraph 98, the support surface is not shown,
3  correct?
4    A    Correct.
5    Q    But, in properly measuring the concave air
6  bed height, doesn't the mattress need to be lying on
7  a support surface?
8    A    No.  I think you can use logical deduction.
9  They don't drop much when you turn them from side to
10 over.
11   Q    Okay.
12   A    And when we did the manometer test, they
13 all pulled a vacuum.  So, in other words, there was
14 adequate air chamber to create the suction effect.
15   Q    Okay.  Can you look back at Aoki, which is
16 Exhibit 9?
17   A    Okay.  Is this some reference in one of my
18 reports?  What --
19   Q    I think you remember.  It is referenced in
20 one of your reports.  But can you look at Aoki
21 Exhibit 9?
22   A    Okay.  All right.
23   Q    When you're looking at figure 2 of Aoki --
24   A    Yes.
25   Q    -- is that figure that -- what's depicted

Page 235

1  there meet the limitations of claim 1g, element 1g
2  of the '926 patent?
3     A    I haven't evaluated that.  It wasn't
4  proffered by your folks.  And I'd have to do that
5  at -- you know, you guys write a report, get an
6  extension, and we'll talk about it.
7     Q    Do you see any relevant differences between
8  that figure 2 in Aoki and the accused products --
9          MR. HARKINS:  Objection.  Form.
10 BY MR. HARBIN:
11    Q    -- relevant to claim element 1g and having
12 the suction cup effect?
13    A    The partitions don't go around the corners,
14 so I doubt it would seal, you know.  But, again, I'm
15 not evaluating it.  I'm just saying it's pretty
16 obvious from the pictures that they're not the same
17 thing.
18    Q    Okay.  We talked about sag, what you would
19 call "reverse camber."
20         And I think you sort of addressed this,
21 but, basically, any span is going to include sag or
22 reverse camber, right?
23    A    Yes.
24    Q    Power lines between two support towers will
25 sag.

Page 237

```
 1     Q    Actually, I apologize.  Hang on.  Yeah, I'm
 2 talking -- I'm sorry.
 3          We're now looking at Exhibit 6, your reply
 4 report.
 5     A    Exhibit 6.  Oh, okay.  Hang on.  That's 5.
 6 Okay.  I've got to pull that up.  I didn't have it
 7 up.
 8          All right.  Okay.  Which paragraph?
 9     Q    Sixty-eight on page 20.
10     A    Okay.  Yes.
11     Q    You state you disagree -- you remember
12 Dr. Singhose opined about sag --
13     A    Yes.
14     Q    -- in the '926 patent?
15     A    Yes.
16     Q    And you state in 68 you disagree with
17 Dr. Singhose that there would be sag allowing the
18 bottom sheet to contact the floor if the bed is
19 properly inflated.
20          So you're not saying -- you're not opining
21 there would not be any sag.  You're just saying, in
22 your opinion, it would not be such that the bottom
23 sheet would contact the floor?
24     A    Correct.  Or would eliminate the suction
25 cup effect.  Still going to be there.
```

Page 238

1  Q    But you did not measure the sag of the
2 bottom sheet, did you?
3  A    No.  But we did -- well, we see his
4 results, and it doesn't look like it's sagged enough
5 to touch the floor.  And, secondly, the -- all the
6 beds we tested had a negative pressure.
7  Q    But you did not actually measure the sag of
8 the bottom sheet, did you?
9  A    No.  We did the manometer test instead.
10 (Inaudible.)
11  Q    Well, it's not instead.  You --
12       THE COURT REPORTER:  "We did the manometer
13 test instead."  What else?
14       THE WITNESS:  That's it.
15 BY MR. HARBIN:
16  Q    You physically -- you could have measured
17 the sag of the bottom sheet, correct?
18  A    Yes.
19  Q    Okay.  And you -- do you agree that the
20 structure set forth in claim 1 of the '926 patent
21 must be configured to act as a suction cup?
22  A    Yes.
23  Q    You agree that, to be covered by the '926
24 patent, a product must be configured such that, when
25 a person gets on the bed, a suction cup effect is

Page 253

1  not grabbed in use.  And it's a highly deformable
2  apparatus.  It's an inflatable bed.  So when you
3  grab it, you deform it and change the characteristic
4  of that peripheral air bag.
5      Q    Let's talk about your manometer test.
6      A    Sure.
7      Q    You conducted it by placing one end of the
8  tube underneath the air mattress?
9      A    Correct.
10     Q    What does the manometer test measure?
11     A    It shows that you get a high pressure when
12 you get on, forcing air out.  And when you move, get
13 off, that corresponds to when you reverse the load
14 on a suction cup.  You pull a vacuum.
15     Q    Sir, in fairness, as engineering, a
16 manometer measures pressure changes, correct?
17     A    Yes.
18     Q    Okay.  A manometer does not test for
19 airflow, correct?
20     A    No.  But we know that air flows from high
21 pressure to low pressure.
22     Q    Okay.
23     A    So we know -- in fact, many flowmeters are
24 actually based on calibration of a preference
25 difference test.

Page 267

1  BY MR. HARBIN:
2      Q    But you say in your report that:
3           "A small pressure differential can
4           exert sufficient force to hold the bed
5           in place."
6           But you don't actually set forth how that
7  happens, correct, in your report?
8      A    Well, the exact amounts are not specified
9  in the patent.  And I'm not trying to create some
10 reconstruction.  I'm just showing you that the
11 pressure difference is there.  And if it's there,
12 it's going to assist, as the reviewers have noted.
13     Q    You did not do any -- well, in paragraph 82
14 of your reply report, you state that "Given the
15 large surface area of the concave air bag in the
16 accused products," it is your opinion that "even a
17 small pressure differential can exert sufficient
18 force to hold the bed in place," which I just
19 referred to, right?
20     A    Right.  Because usually the kind of things
21 you're trying to avoid is when someone moves or gets
22 off the bed, you don't want it sliding.  It
23 doesn't -- we're not looking at large forces.
24     Q    You did not do any test to measure the
25 force holding any of the air mattresses in place,

Page 268

1  did you?

2      A    No.  I'm just showing the effect is there
3  and that it will apply a resisting force.

4      Q    And you did not push on the beds to check
5  to see if they were suctioned to the floor during
6  your manometer test, correct?

7      A    That's correct, because the sliding is
8  usually someone getting on and off the bed or moving
9  on the bed, which is different than pushing on the
10 bed.

11     Q    Let me turn to your critiques of
12 Dr. Stevick's pull test.

13     A    You mean Singhose's pull test?

14     Q    I'm sorry.  Yes.  Sorry.

15     A    It's all right.

16     Q    And I'll be referring to your reply report.

17     A    Okay.  Let's see, that's Exhibit 6?  Yes.

18     Q    Right.

19     A    Okay.

20     Q    And we'll start with paragraph 88.

21     A    All right.

22     Q    You state that:

23          "Dr. Singhose discusses friction at
24          length, but makes no attempt to quantify
25          it or explain the impact that's variable

1

2

3

4

5      I, GLEN STEVICK, PhD, having appeared

6  remotely for my video-recorded videoconference

7  deposition on August 20, 2021, hereby certify under

8  penalty of perjury under the laws of the United

9  States of America that the foregoing is true and

10  correct.

11         Executed this _____ day of _____

12  202__, at _____, _____.
                      (city)                (state)

13

14

15

16          _____

17               GLEN STEVICK, PhD

18

19

20

21

22

23

24

25

Page 304

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2            I, Marla Sharp, a stenographic reporter
3   certified in California, Oregon, and Washington,
4   hereby certify:
5            That the foregoing video-recorded
6   videoconference deposition of GLEN STEVICK, PhD, was
7   taken remotely before me on August 20, 2021, at
8   which time the witness was duly remotely sworn by
9   me;
10           That the testimony of the witness and all
11  colloquy and objections made at the time of the
12  deposition were recorded stenographically by me and
13  thereafter transcribed, said transcript being a true
14  copy of my shorthand notes thereof;
15           That review of the transcript was neither
16  requested nor waived before completion of the
17  deposition; ( ) that the witness has failed or
18  refused to approve the transcript.
19           I further certify I am neither financially
20  interested in the action nor a relative or employee
21  of any attorney of any of the parties.
22           In witness whereof, I have subscribed my
23  name and signature this date, September 2, 2021.

*Marla Sharp*

24  _____
      Marla Sharp, RPR, CLR, CCRR,
25    OR CSR 17-0446, CA CSR 11924, WA CSR 3408