IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| THE COLEMAN COMPANY, INC. §<br>　　　Plaintiff/Counterclaim Defendant, §<br>　　　　　　§<br>v. §<br>　　　　　　§<br>　　　　　　§<br>TEAM WORLDWIDE CORPORATION §<br>　　　Defendant/Counterclaim Plaintiff, §<br>　　　　　　§<br>and §<br>　　　　　　§<br>CHENG-CHUNG WANG §<br>　　　Counterclaim Plaintiff. § | Case No. 2:20-CV-0351-RGD<br><br>JURY TRIAL DEMANDED |

**MEMORANDUM IN SUPPORT OF TEAM WORLDWIDE CORPORATION'S MOTION TO EXCLUDE AND STRIKE PORTIONS OF EXPERT TESTIMONY OF GARY D. OLSEN**

Defendant Team Worldwide Corporation ("TWW"), by and through its undersigned counsel, submits the following as its Memorandum in Support of TWW's Motion to Exclude and Strike Expert Testimony of Mr. Gary Olsen.

**I.   INTRODUCTION**

Plaintiff Team Worldwide Corporation ("TWW") hereby moves this Court, pursuant to Federal Rule of Evidence 702, to exclude and strike the portions of the expert opinions and proffered testimony of Gary D. Olsen addressed herein, who has been identified as an expert witness by Plaintiff and Counterclaim Defendant The Coleman Company, Inc. ("Coleman").

The opinions proffered by Mr. Olsen suffer from two key defects: (1) Mr. Olsen fails to perform any technical or economic comparability analysis for his use of Coleman patent licenses and agreements; and (2) Mr. Olsen relies on a document to support his proposed royalty rate which has no connection to the accused products or even inflatable airbeds in general. None of Mr.

Olsen's opinions identified in this Motion are sufficiently reliable to survive the Court's gatekeeper function under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). TWW further requests that this Court enter an Order precluding Coleman from offering at trial any evidence, testimony, or argument related to any material excluded and stricken pursuant to this Motion.

## II.     LEGAL STANDARD

"The admissibility of expert testimony is governed by the Federal Rules of Evidence and the principles laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). When applying *Daubert*, the court's task "is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995). Importantly, "[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Anderson v. Nat'l R.R. Passenger Corp.*, 866 F. Supp. 937, 949 (E.D. Va. 1994) ("[A]n expert's opinion is not to be accepted merely because it is articulated, but must instead have a factual basis."); *Padgett v. Synthes, Ltd (USA)*, 677 F. Supp. 1329, 1334-35 (W.D.N.C. 1988) (granting a directed verdict where the expert's testimony rested upon unsupported assumptions), *aff'd* 872 F.2d 418 (4th Cir. 1989).

The Federal Circuit requires that the "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009). The Federal Circuit is clear that "[a]n expert must show that prior agreements contain comparable technology and that the agreements themselves compare economically to the hypothetical license at issue in the present case." *Limelight Networks, Inc. v. Xo Communs., LLC*, Civil Action No. 3:15-CV-720-JAG, 2018 U.S.

Dist. LEXIS 17802, at *18-19 (E.D. Va. Feb. 2, 2018) (citing *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010)). In addition to determining if licenses are technically comparable, the Federal Circuit has explained certain minimum criteria for economic comparability: "*Lucent* is relevant because it explained general criteria for comparing patent licenses--specifically, the differences between lump-sum royalties (where the patentee receives a single upfront payment) and running royalties (where the patentee collects ongoing per-unit or percentage payments)." *Wordtech Sys.*, 609 F.3d at 1319.

The Federal Circuit has cautioned that "'district courts performing reasonable royalty calculations [must] exercise vigilance when considering past licenses to technologies other than the patent in suit'" (*Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010))), and "'must account for differences in the technologies and economic circumstances of the contracting parties[.]'" *Id*. (quoting *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010)).

**III.   ARGUMENT**

    **A. MR. OLSEN'S OPINIONS ON PATENT LICENSES SHOULD BE EXCLUDED AS HE FAILED TO PERFORM ANY TECHNICAL OR ECONOMIC COMPARABILITY ANALYSIS.**

This Court should exclude testimony and opinions by Mr. Olsen related to patent licenses and agreements as he failed to perform the required technical and economic comparability analysis mandated under Federal Circuit law. *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit.").

3

On July 23, 2021, Mr. Olsen submitted an amended report on damages[1] in which he opined that Coleman is entitled to damages in the form of a reasonable royalty based on a hypothetical negotiation between the parties using a *Georgia-Pacific* analysis.[2] Exhibit A, Amended Expert Report of Gary D. Olsen, July 23, 2021, Schedule 2 (hereinafter, "Olsen Opening Report"). In his discussion of Factor 2 of a *Georgia-Pacific* analysis. Mr. Olsen cites fourteen different Coleman patent licenses or settlement agreements and states "it is reasonable to conclude that the parties would have considered a royalty at the high end of the range between 3% and 7%." *Id.* at ¶ 33. Critically, Mr. Olsen's Opening Report includes ***absolutely no analysis whatsoever of either the technological or economic comparability of the cited patent licenses and settlement agreements*** and engages in no discussion of their relevance in determining a reasonable royalty rate between the parties in this case. Instead, Mr. Olsen simply inserts a table in his Report listing various licenses:

---

[1] Mr. Olsen's initial opening report on damages was served on July 6, 2021.
[2] *See Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers Inc.*, 318 F. Supp. 1116, (S.D.N.Y. 1970), modified and affirmed, 446 F. 2d 295 (2d Cir. 1971).

4

Table 5

| No. | Licensor | Technology Licensed | Rate |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |

See id. at ¶ 32. The Federal Circuit is clear: "[a]n expert **must** show that prior agreements contain comparable technology and that the agreements themselves compare economically to the hypothetical license at issue in the present case." *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (emphasis added). Mr. Olsen has failed the Federal Circuit's required test by not showing **any** technological or economic comparability of his fourteen cited Coleman patent licenses or settlement agreements to the hypothetical negotiation between the parties. For example, Mr. Olsen does not even discuss whether his cited licenses and agreements are running royalty versus a lump sum payment as required by the Federal Circuit. *Wordtech Sys.*, 609 F.3d at 1319. ("*Lucent* is relevant because it explained general criteria for comparing patent licenses--specifically, the differences between lump-sum royalties (where the

5

patentee receives a single upfront payment) and running royalties (where the patentee collects ongoing per-unit or percentage payments)"). This Court should exclude such unreliable opinions.

Mr. Olsen's only other discussion in his Opening Report on licenses is Schedule 12 of his Report, which only consists of a table of various license and settlement agreements and is misleadingly titled "Analysis of License and Settlement Agreements" despite offering zero analysis of any of the licenses and agreements listed. Ex. A, Olsen Opening Report, Schedule 12. This table merely lays out quick, scant facts of each license or agreement including the dates, parties, products, sales area, exclusivity, royalty payment, and term. *Id.* This is the full extent of his analysis offered. Such conclusory tables do not constitute analysis and are devoid of any explanation as to why the licenses are technologically and economically comparable for use in a hypothetical negotiation involving the accused air mattresses in this case and should therefore be excluded at trial. *Limelight Networks, Inc. v. Xo Communs., LLC*, Civil Action No. 3:15-CV-720-JAG, 2018 U.S. Dist. LEXIS 17802, at *18-19 (E.D. Va. Feb. 2, 2018) ("[a]n expert must show that prior agreements contain comparable technology and that the agreements themselves compare economically to the hypothetical license at issue in the present case") (citing *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010)).

In her rebuttal damages report, TWW's damages expert, Dr. Nisha Mody, specifically identified this fatal flaw in Mr. Olsen's Opening Report stating that Mr. Olsen assumes the licenses are comparable "[w]ithout any analysis or assessment of technical or economic comparability…." *See* Exhibit B, Rebuttal Report of Nisha Marie Mody, Ph.D., July 30, 2021, at ¶ 31. Despite Dr. Mody identifying Mr. Olsen's failure on licenses for him, Mr. Olsen did not even address license comparability in his subsequent reply report. *See* Exhibit C, Reply Expert Report of Gary D. Olsen, August 12, 2021, at ¶¶ 20-21.

When questioned in his deposition, Mr. Olsen confirmed his failure to perform the required economic and technological comparability analysis. First, Mr. Olsen confirmed he did not even have discussions with a technical expert so as to determine if any of the licenses he cited were technically comparable:

> Q. For the licenses you identify in Table 5 below, do you cite in your – anywhere in your reports any discussions with any technical experts concerning the licenses in Table 5 in Exhibit 2?
>
> A. I do not.

Exhibit D, Deposition Transcript of Gary Olsen, August 23, 2021, 48:6-11. Mr. Olsen also confirmed he performed no economic comparability analysis for the licenses he cited in his Opening Report:

> Q. Going back to Exhibit 2 in the section as paragraphs 31 through 33. Do you provide any opinions in Exhibit 2 on the economic comparability of each of the licenses you identify in Table 5?
>
> MR. THOMAS: Object to form.
>
> A. I do not.

*Id.* at 50:11-17. Mr. Olsen's own testimony confirms that this Court should exclude his opinions related to patent licenses and agreements as unreliable.

Also, Mr. Olsen's opinions are unreliable and inadmissible. He made no attempt to lay a foundation in his Opening Report that the licenses listed in his Table 5 and Schedule 12 are technically or economically comparable for the purposes of the hypothetical negotiation between Coleman and TWW for a license to the '618 Patent. Instead, Mr. Olsen only recites bare facts about the various licenses without tying them to this case at all. Because he failed to provide the technical and economical comparability analysis of the cited patent licenses and agreements required under Federal Circuit law, Mr. Olsen's opinions on past licenses and agreements are unreliable and inadmissible under *Daubert*. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330

7

(Fed. Cir. 2014); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010). For this reason, this Court should exclude and strike at least paragraphs 31-33 in Mr. Olsen's Opening Report, including Table 5 and Schedule 12, and paragraphs 20 and 21 in Mr. Olsen's Reply Report.

### B. MR. OLSEN IMPROPERLY RELIES ON A DOCUMENT TO SUPPORT HIS PROPOSED ROYALTY RATE THAT HAS NO CONNECTION TO THE ACCUSED PRODUCTS.

To support his purported "Starting Royalty Rate" of 6.3% in his Report, Mr. Olsen improperly relies on a 2012 paper which he admits does not even address inflatable airbeds. Under Rule 702, reliable testimony cannot be based on opinions unsupported by facts. *See Anderson v. Nat'l R.R. Passenger Corp.*, 866 F. Supp. 937, 949 (E.D. Va. 1994) ("[A]n expert's opinion is not to be accepted merely because it is articulated, but must instead have a factual basis.").

In his Opening Report, Mr. Olsen states that "[i]ndependent research indicates that average royalties in the Consumer Products industry are approximately 6% of revenue." Ex. A, Olsen Opening Report, ¶ 47. Mr. Olsen argues this "customary rate can create an appropriate base for a reasonable royalty rate" under Factor 12 of a Georgia-Pacific analysis.[3] But the 2012 paper on which Mr. Olsen relies **does not even mention airbeds or inflatable products**. *See* Exhibit E, Profitability and royalty rates across industries: Some preliminary evidence, KPMG, 2012.

The document cited by Mr. Olsen purports to discuss how reported royalty rates in broad industry groups compare to the so-called 25 percent rule – which the Federal Circuit has held is a

---

[3] Factor 12 of a Georgia-Pacific analysis states "the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions" *See Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers Inc.*, 318 F. Supp. 1116, (S.D.N.Y. 1970), modified and affirmed, 446 F. 2d 295 (2d Cir. 1971).

"fundamentally flawed rule."[4] See Ex. E, pg. 2. The broad industry groups (such as consumer, energy, telecom), listed along the bottom of the chart below, are undefined and the 2012 document provides no information on what is included in a particular group. Mr. Olsen cites to pp. 6-8 of the document for the "Consumer Products industry," but the sole reference in the document for any consumer related royalty rate is the table below:

**CHART 1: REPORTED ROYALTY RATES VS. RATES FROM THE 25 PERCENT RULE**

Sources: RoyaltySources, December 2007 and authors' calculation based on CompuStat Research Insight CD-ROM, December, 2007

Ex. E, pg. 9. This sole reference Mr. Olsen relies on provides no connection to the accused products – inflatable air beds – beyond the generic label "consumer." Opinions based on such speculative information, unconnected to the accused products, cannot be the basis for reliable testimony. *See Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not

---

[4] *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312, 1315 (Fed. Cir. 2011) ("The Rule suggests that the licensee pay a royalty rate equivalent to 25 per cent of its expected profits for the product that incorporates the IP at issue…."This court now holds as a matter of Federal Circuit law that the 25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation.").

9

supported by the record."). This Court should exclude Mr. Olsen's opinions based on this 2012 document as unreliable.

In his deposition, Mr. Olsen confirmed that, despite citing the 6 percent royalty identified in the 2012 document, he did not know if this royalty had any connection to inflatable air beds:

> Q. And in paragraph 47 you cite that the average royalties in consumer product industry are approximately 6 percent of revenue; is that correct?
>
> A. Yes.
>
> Q. Okay. And have you seen any single license agreement from this typical royalty rate in the consumer products industry that's 6 percent?
>
> A. No. I've only seen the results of the article.
>
> Q. And what products are included in consumer products in the report that you cite?
>
> A. I'm sure it's a very wide range of products.
>
> Q. Okay. Do you know that this includes licenses for air beds?
>
> MR. THOMAS:· Object to form.
>
> A. As I understand that, an air bed would be a consumer product, so stands to reason that they would be included.
>
> Q. So you don't have any independent knowledge that the document that you cite, the KPMG document, includes air beds, and what it's portraying for the average royalties in the ·consumer products industry?
>
> A. No independent knowledge.

Ex. D, 45:2–46:6. Mr. Olsen's opinions based on this 2012 document are flawed and without support. Accordingly, this Court should exclude and strike at least paragraphs 47 and 48 in Mr. Olsen's Opening Report and paragraph 25 in his Reply Report.

### IV. CONCLUSION

For the foregoing reasons, the Court should exclude and strike portions of Mr. Olsen's Opening and Reply Reports and enter an order precluding Coleman from offering at trial any

evidence, testimony, or argument related to any material excluded and stricken pursuant to this Motion.

Dated: November 5, 2021

Respectfully submitted,

_s/ Alexandra M. Gabriel
Alexandra M. Gabriel (VSB No. 89185)
William R. Poynter (VSB No. 48672)
David Sullivan (VSB No. 45027)
KALEO LEGAL
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Phone: 757.238.6383
Fax: 757.304.6175
agabriel@kaleolegal.com
wpoynter@kaleolegal.com
dsullivan@kaleolegal.com

Thomas M. Dunham (pro hac vice)
J. Michael Woods (pro hac vice)
**RuyakCherian LLP**
1901 L St. NW, Suite 700
Washington, DC 20036
Telephone: (202) 838-1560
tomd@ruyakcherian.com
michaelw@ruyakcherian.com

Korula Cherian
Robert Harkins
**RuyakCherian LLP**
1936 University Ave., Ste. 350
Berkeley, CA 94702
Telephone: (510) 944-0190
sunnyc@ruyakcherian.com
bobh@ruyakcherian.com

*Attorneys for Team Worldwide Corporation and Cheng-Chung Wang*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing on November 5, 2021, with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all registered users.

 s/ Alexandra M. Gabriel
Alexandra M. Gabriel (VSB No. 89185)
KALEO LEGAL
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Phone: 757.238.6383
Fax: 757.304.6175
agabriel@kaleolegal.com