IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| THE COLEMAN COMPANY, INC. <br><br> Plaintiff/Counterclaim Defendant, <br><br> v. <br><br> TEAM WORLDWIDE CORPORATION, <br><br> Defendant/Counterclaim Plaintiff. | C.A. No: 2:20-cv-351-RGD |

**COLEMAN'S OPPOSITION TO TWW'S MOTION TO EXCLUDE AND STRIKE CERTAIN OPINIONS BY DR. SINGHOSE AND MR. OLSEN**

The Court should deny TWW's motion to exclude and strike (ECF No. 158).[1] The infringement opinions for several TWW product models offered by Coleman's expert witness, Dr. William Singhose, and the corresponding damages opinions based on those infringing models offered by Mr. Gary Olsen, are reliable and proper.

As TWW notes in its motion, Dr. Singhose identified 92 TWW product model numbers as accused infringing devices. TWW's motion attempts to remove over half of these accused products from the case based on the unsupported assertions that Dr. Singhose's opinions are irrelevant (as to 12 models) or "unreliable" (as to 47 models). TWW's first argument fails: The 12 products are plainly relevant, as they exemplify TWW's continuous patent infringement and are part and parcel of Dr. Singhose's full analysis of the accused products. TWW's second argument also fails: Dr. Singhose's infringement analysis rested on a thorough inspection of the internal construction of nearly one-third of the accused models—as TWW concedes in its brief

---

[1] TWW's memorandum in support is at ECF Nos. 159 (public, redacted version) and 163 (confidential, sealed version).

1

(ECF No. 159, 6)[2]—all of which he found to possess identical infringing structures. Based on this analysis, as well as other reasoned and fully supported inferences—explained in detail in his report—Singhose concluded that all accused products infringed, including those for which he was not able to conduct a hands-on analysis. TWW is free to contest such determination through cross-examination, if any.

Moreover, TWW's supposed "unreliability" of Dr. Singhose's "Improper 'Representative' Analysis" is baseless. Indeed, TWW does not *dispute* that the accused models possess the *same internal structures*. In addressing a previous attempt by TWW to trim the number of accused products, the Court asked TWW counsel, "is there any dispute about whether or not the newly-identified products contain the specific feature that's alleged to be infringing?" TWW's counsel replied that *there was not* because "the newly-identified products"—which are some of the ones covered in TWW's challenge here to Singhose's representative analysis — "contain the same structure that the original seven accused products contained and some of the additional products that were added later in the case." ECF No. 115, 4:8–16. The Court later asked again, "Didn't you tell me at the outset that these … new products have the same accused feature as the originally identified products? So why would you think they were non-infringing?" TWW counsel did not dispute the Court's characterization of the prior admission and responded, instead, that TWW believed the then-non-accused products did not infringe simply because they had not yet been identified by Coleman as infringing. *Id.* at 6:6–13.

Further, TWW's expert Dr. Stevick likewise considered TWW products to have the same internal structures—both in his *affirmative* report opining that they embody TWW's '926 patent

---

[2] *See* ECF No. 159, 6 (conceding that Dr. Singhose "examined the *interior construction of 33 products* based on physical samples, product specifications, or other documents identified in his reports" (emphasis added)).

and his rebuttal attempting to assert that TWW does not infringe Coleman's '618 patent. *See* ECF No. 162-2 ¶ 33–35 (asserting that "All of the remaining Accused Products … practice TWW's Sure Grip design" and therefore "do not infringe" because they *all* "include multiple air chambers"); ECF No. 143 ¶ 147 (treating analysis of single TWW Sure Grip labeled product as "representative [of] TWW products" embodying the '926 patent); *id.* ¶¶ 43–50 (discussing other "example[s]" of TWW Sure Grip products as alleged evidence of the value of the '926 patented design).

TWW's transparent attempt to shave the number of infringing products—and thus the damages owed to Coleman—based on hyper-technical and incorrect characterizations of Dr. Singhose's opinions should be rejected.

    **A.**    **There is no error or unreliability in Dr. Singhose's "representative" analysis of the 47 products TWW seeks to exclude from the case**

Starting with TWW's second argument, Dr. Singhose had more than sufficient facts and data to opine that the 47 models at issue in TWW's motion infringe the '618 patent. TWW concedes that Dr. Singhose "examined the interior construction of 33 products based on physical samples, product specifications, or other documents identified in his reports." ECF No. 159, 6.[3].

For the remaining product models, Dr. Singhose was not able to directly observe the interior structures, so instead he reasonably relied on reasoned inferences—from his (unchallenged) perspective as an expert and in view of all the materials he considered—to opine that the products infringe. While TWW argues that Dr. Singhose could have "no reliable basis" for the inferences he made (ECF No. 159, 9), he in fact did have a sufficient basis for his

---

[3] TWW also concedes that 27 of those 33 products were physically examined by Dr. Singhose in his opening report. *Id.* at 7–8 (noting he "additionally examined" 6 more product in response TWW's expert's rebuttal)

3

opinions. In this regard, notably absent from TWW's argument is any direct citation or explanation of exactly *what* Dr. Singhose did or *why* he inferred what he did. Coleman supplies that information for the Court below. At the most generous, TWW's criticisms of Dr. Singhose's analyses go to the weight of his expert testimony and constitute issues for the jury to decide; they do not rise the level of triggering this Court's gatekeeping role under *Daubert*. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

      **1.**      **Dr. Singhose's representative analyses were thorough and supported his opinions for products where he could not directly observe the internal structures**

First, Dr. Singhose explained why he believed a representative analysis was both possible and appropriate. He opines that "[o]nce the interior of a representative product has been examined, it is easy to establish how the interior structures *are linked to the exterior shapes*," and that a person skilled in the art (such as Dr. Stevick) can "identify the internal structures using external indications of the internal structures." ECF No. 163-01 (Ex. A to TWW Motion, Singhose Report) ¶ 43. For example, Dr. Singhose explained how the "dimples" on the top panel of the representative products "are caused by internal coils that are affixed to both" the top and bottom panels. *Id.* ¶ 46. Not only that, but "[w]ithout these coils extending from the top panel to the bottom panel, the top and bottom panels would bulge outward to form a bulbous shape that would not work well as a sleeping surface for a mattress." *Id.* Dr. Singhose similarly explained that the "three-bump shape" he observed was formed because "two internal side support beams limit the outward expansion of the side panel." *Id.* ¶ 47; *see also id.* ¶¶ 48–49 (explaining photographs illustrating these structures). Thus, according to Dr. Singhose, a number of "externally-visible features help identify internal structures that practice key limitations of the '618 patent" and are "tell-tale indicators" of infringement. *Id.* ¶ 50. And when performing his detailed analysis of actual products in his possession, Dr. Singhose further corroborated those

4

preliminary "overview" opinions with specific examples. *E.g.*, *id.* ¶¶ 64–65 (showing internal and external views of coils and the dimples they cause), 66–67 (showing internal and external views of the internal support beam and external seams they cause), 72 and 80 (illustrating how the claimed internal side support beams limit outward expansion of the side panels and the side "no longer has a three-bump outer structure" when the internal side support beams are removed), 105 (explaining and illustrating how the top internal side support beam creates an "edge" on the top surface of the bed).[4]

In addition to the "representative sample" of the Insta-bed that Dr. Singhose analyzed in detail, he also directly and physically inspected 3 of the 26 more models within the "insta-bed" line of products and examined specification sheets for 7 of the 26. *Id.* ¶ 128–129. TWW does *not* challenge the admissibility of Dr. Singhose's opinions on those products (including the 7 products for which he only viewed specification sheets).

After this extensive review of multiple products that showed how the internal structure correlates with the external shapes of the beds, Dr. Singhose then reviewed numerous documents including photographs and descriptions which displayed the "tell-tell outer features that indicate the internal structures practice the asserted claims." *Id.* ¶ 129. Dr. Singhose conducted a similar

---

[4] Dr. Singhose also used a "probe camera" to inspect the interior of *inflated* air mattresses to see how various internal structures would look and function when the bed is in actual use. See id. ¶¶ 122–127.

set of detailed, parallel analyses for a series of "Serta" branded products (*id.* ¶¶ 130–194)[5] and "SoundAsleep" products (*id.* ¶¶ 195–262).[6]

Next, Dr. Singhose presented opinions about several other lines or brands of products, some of which included physical inspection (e.g., *id.* ¶ 267), some that included review of specifications (e.g., *id.* ¶ 270), and some of which included reviewing product "photographs and descriptions" or product manuals (e.g., ¶¶ 263–266). As noted in earlier briefing and never disputed by TWW, "many of [the accused beds] have not been sold for years" and are "no longer 'available'" for purchase and inspection by Dr. Singhose—barring TWW locating and producing them for inspection. ECF No. 103, 2; *id.* at 9 ("TWW's assertion that Coleman should have purchased all possible infringing airbeds ignores that several of the TWW accused products are discontinued and no longer available for purchase."). So for at least some products, it was not even *possible* for Dr. Singhose to inspect "internal construction"—as TWW contends he should have.

For those products where he only inspected "photographs" and the like—showing only the product exteriors—Dr. Singhose explained why he believes those products infringe, in view of *all* of the products and same structures he had already reviewed: "Given their dimensions, the three-bump side wall structures, and the dimpling of the top sleep surfaces, … more likely than not, the products practice the asserted claims." *E.g.*, *id.* ¶ 262 (noting the "bases for my infringement opinions are substantially the same as those I presented above for the insta-bed,

---

[5] Dr. Singhose physically inspected 6 of 30 Serta mattresses and reviewed "specification sheets" for 4 more Serta mattresses, *id.* ¶ 194, and TWW does not challenge the basis of his infringement opinions on these products.

[6] Dr. Singhose physically inspected 4 of the 7 accused SoundAsleep mattresses and reviewed "specification sheets" 3 of the 7. He only relies on photographs for 3 of the seven models. *Id.* ¶ 261.

6

Serta, and SoundAsleep products"); *id.* ¶ 263 (referring additionally to a product manual he reviewed). For a limited number of "unspecified brand" products, he explained his opinion, based on all the products and documents reviewed, that "when TWW uses the same core digits in two different SKUs, then the two mattresses have the same structure." *Id.* ¶ 271. He gave examples of differences in SKU numbers indicating "cosmetic differences such as brand labels and colors," giving a repeated SKU number for an Insta-bed and Serta branded model as an example. *Id.* (citing a TWW-produced document); see also *id.* ¶¶ 272–275 (opining that other identified products contain "substantially similar" infringing structures based on TWW's "reuse of core SKU numbers and the use of letters for prefixes and suffixes").

Finally, Dr. Singhose included a summary of the *methods* of the analyses in his report, and how there were based, in his words, on "six types of evidence: i) Detailed physical inspection of samples, ii) Sample inspection by probe camera, iii) Cross-sectional dissection of samples, iv) Review of specifications, v) Review of product photographs, and vi) Analysis of disclosure documents." *Id.* ¶ 276. He also included an appendix identifying specific TWW and other documents relied upon for models where those were used. *Id.* His Appendix D is attached as Exhibit A to this opposition brief.[7]

In his reply report, Dr. Singhose then "examined the interior construction" of 6 more products, as TWW admits. ECF No. 159, 7–8. In that Reply Report, Dr. Singhose noted the criticism from TWW's expert Dr. Stevick as to the supposed lack of basis to offer infringement opinions, so Dr. Singhose defended his approach: "I will note that [my infringement opinions] included full detailed examinations of several exemplar products, direct inspection and

---

[7] TWW's brief referred to Singhose's Appendix D, but TWW did not include it within Exhibit A to TWW's motion. See ECF No. 159, 7 (citing "Ex. A [ECF No. 163-1], Singhose Opening Report, Appendix D, columns 1–6").

7

measurement of numerous other products, review of product specifications, viewing of product photographs, and review of additional documents that speak to the nature of the accused products." ECF No. 163-4 (Ex. D to TWW Motion, Singhose Rebuttal Report) ¶ 43. And Dr. Singhose explained that, in response to some of Dr. Stevick's "suggestions" that there might be "materially-different" internal structures, he "physically examined *several additional product samples*" to confirm his opinions. *Id.* ¶ 60. Dr. Singhose found that each of the 6 additional product he obtained and analyzed "has the same internal structure in terms of the 618 asserted claim limitations" as a corresponding product he originally based his inferences on. *Id.* ¶¶ 62, 64, 66, 68, 70, 72 (showing pictures and explaining bases for each conclusion). As Dr. Singhose summarized, "All of the additional models that I investigated had essentially the same internal structures—as I indicated in my initial 618 Infringement Report." *Id.* ¶ 89.

In sum, Dr. Singhose conducted a detailed analysis of dozens of models of TWW airbeds. TWW does not challenge the reliability of Dr. Singhose's analysis for many of those products. Rather, TWW only challenges the admissibility of Dr. Singhose's opinions about the products where he relied on *only* what Singhose refers to in his Report as "Review of product photographs" and "Analysis of disclosure documents," which are also shown in Appendix D (Exhibit A) columns 7–8, "Pictures" and "Disclosures" citing the corresponding "Disclosure Docs" or "WebLink." Dr. Singhose explained the basis for relying on these exterior pictures and descriptions, and he explained how he drew a connection between the internal structures recited in the claims (and observed identically in numerous physical samples) and the exterior depictions in the documents he cited.

### 2. TWW's conclusory arguments should be rejected

Against Dr. Singhose's detailed explanation of multiple methods of analyses, *and even after TWW counsel's admission that all the accused products "contain the same structure,"*

8

TWW makes a conclusory argument that Singhose has "no reliable basis" for his opinions as to 47 models. This contention is without merit.

TWW's first of two challenges to this method of proceeding is to argue, vaguely, that while such a representative analysis *can* be used sometimes, it is only appropriate when "there is a reliable basis for comparison." As shown above, Dr. Singhose provided ample reasoning and rationale for why, in his opinion, the 47 models challenged by TWW infringe the '618 patent. TWW cites two cases for the proposition that an expert "cannot simply assume" the products are like the one he tested. ECF No. 159, 8. But those cases are inapposite because the experts did not engage in or explain their analysis as Dr. Singhose has done; they made pure assumptions. In *L&W, Inc. v. Shertech, Inc.*, the court noted that the expert's summary judgment declaration "assume[d], without support, that all of [the accused infringer's] products are structurally similar." 471 F.3d 1311, 1317–18 (Fed. Cir. 2006); *id.* at 1316 (explaining the expert "conducted a specific analysis" of only 1 out of 16 accused products but that there was "no evidence to support" the expert's conclusion that the single product was "'typical' of all of the accused products"). Similarly, in *Alloc, Inc. v. Pergo, L.L.C.*, the district court granted summary judgment for the accused defendant because the patentee had "not presented *any evidence*, through [its expert] or otherwise, indicating *how* the testing of only three products provides evidence of infringement for the remaining, untested products." 751 F. Supp. 2d 1049, 1059 (E.D. Wis. 2010) (emphasis added).

Here, Dr. Singhose did not merely "assume" the products were structurally similar like the expert in *L&W*. Instead, he directly examined a large portion of the accused products and found them all to possess materially the same structures—a fact conceded by TWW to this Court. And, unlike the expert in *Alloc*, Dr. Singhose then explained *why and how* the (identically

9

found) internal structures in the directly examined products produced the "tell-tale" external indicia that led to his conclusion of infringement for the indirect observations. *E.g.*, ECF No. 163-1 ¶¶ 50, 129. Coleman's Motion for Summary Judgement (ECF Nos. 134–135) explains why there is not even a genuine dispute of material fact regarding the question of TWW's infringement. But even if the Court were to not agree, that is *at best* because there is a dispute about the quantum or quality of the evidence—material TWW can challenge at trial through cross-examination.

TWW points to one "example" of why it (and its expert) believe relying on the external features is insufficient, but that example is likewise flawed. TWW cites a website that Dr. Singhose referenced "with an image purportedly showing the interior construction for an airbed" with a "materially different design," although the exterior product photos "show the *same* external features" that Singhose opined were "tell-tale" signs of infringement. ECF No. 159, 10–11. But in the deposition testimony in between the two brief passages TWW cites, Dr. Singhose explained his opinion was that the *purported* interior construction image was "not a correct representation of this internal structure." ECF No. 163-5 (Ex. E to TWW Motion, Singhose Dep. Excerpt), 135:5–8. When challenged for the "basis" of his testimony the image was incorrect, he explained that the "indentations and seams are making a shape that does not correspond to the internal structure at all." *Id.* at 135:23–137:11.

Thus, the evidence of record is that Dr. Singhose has opined that the model in question (JCA-QD35BP) infringes based on the evidence of its exterior product pictures publicly available on Amazon.com, and, detailed above, his Report provides the basis for his opinions connecting the exterior features to the internal structures. At the same time, there is some contrary evidence on the same website suggesting an internal product structure that Singhose

agree would *not* infringe, and Singhose has testified why he believes the internal product structure cannot match the external product photos on the same page. At best, this single example plucked out by TWW is an example for cross-examination—not the *exclusion* of an entire category of reasoned expert analysis.

Last, TWW complains that Dr. Singhose is "attempting to justify" his earlier, supposedly faulty analysis with belated new analysis. ECF. No. 159, 11–12. But Singhose provided these additional examples simply to show the disingenuousness of Dr. Stevick's and TWW's position; that no matter how many products he looks at, they're all the same. The only thing that is "*ipse dixit*" about this issue is TWW contention that Dr. Singhose's opinions constitute it. While TWW claimed that Dr. Singhose's opinions lacked a "reliable basis," Coleman has pointed to and quoted extensively from his Report to show how he arrived at the challenged opinions. The path that Dr. Singhose followed leads to the same conclusion that TWW's counsel admitted to the Court: the challenged products contain the same structures. Not only are Dr. Singhose's opinions not unreliable, but they are also *undisputed*.

**B.     Dr. Singhose's testimony about the 12 other products is relevant**

TWW also moves to exclude opinions about 12 products that it states "were not offered for sale or sold by TWW in the United States during the damages period." ECF No. 159, 5. TWW presents three faulty bases for its contention that the products were not sold. First, TWW points to the Rebuttal (Non-Infringement) Report of its own technical expert, who in fact merely states "it is *my understanding* that TWW has not sold or offered for sale" those 12 product models. ECF No. 163-2 ¶ 25. Dr. Stevick does not explain on what he bases that

11

"understanding."[8] TWW certainly could have presented affirmative evidence of lack of sales if it wanted to, but it did not, and Dr. Stevick's "understanding" is not admissible evidence. Second, TWW points to Coleman's damages expert's analysis, saying he "did not have any sales data" for those products. In fact, Mr. Olsen referred to the "*Missing* Sales data" for those 12 products. ECF No. 163-3, Schedule 2 p. 5 of 35 (page 41 of 71 pages in Exhibit C). Last, TWW says Dr. Singhose "did not dispute" that these 12 products were not offered for sale. But as the *technical* expert, Singhose had no reason or basis to dispute what was or wasn't offered for sale during the damages period—in the same way that Dr. Stevick did not either.

Even more, Dr. Singhose *contradicts* TWW's assertion for 3 of the 12 challenged products, which he states in his Report that he "physically dissected." ECF No. 163-1 ¶¶ 129, 194 (referring to the 84000417, 985290221, and 98500616 models, Numbers 7–9 on TWW's list). TWW asked Dr. Singhose about the 12 products in his deposition, and he testified (consistent with his Report) that he was "certain" he physically examined at least those three models. Exhibit B (Singhose Add'l Dep. Tr. Excerpts), 142:24–143:23.[9] Plainly he could not have examined the physical samples if he had not obtained them. *See also id.* at 35:14–24 (Dr. Singhose explaining, in response to TWW counsel's question, how he obtained the physical samples).

Even if some of the products were not sold during the damages period, that does not mean Dr. Singhose's opinions based on the documents TWW produced and he indisputably

---

[8] Earlier in his report, Mr. Stevick states he had "discussions" with TWW's General Manager Ken Wang about "certain Accused Products that are not in fact sold by TWW." *Id.* ¶ 8. That is the only possibly relevant statement in his report.

[9] Coleman withdraws its "RESTRICTED – ATTORNEYS EYES ONLY" designation, under the Protective Order, as to the pages of Dr. Singhose's deposition transcript in the attached Exhibit B. This withdrawal does not apply to any other pages not otherwise already de-designated.

reviewed should be excluded. That conclusion is beyond question for the 3 products he physically inspected.[10] For the other 9 products, Dr. Singhose's Report and Appendix D reflect that he reviewed product pictures. Those pictures, as explained above, were consistent with the overall pattern of identical products sold by TWW under numerous brands and immaterially different configurations. Thus his analysis of these 12 product numbers is part and parcel of—and relevant to—the overall conclusions and opinions Singhose offers in the case. And there is no prejudice to TWW because Coleman concedes it has not offered damages opinions from Mr. Olsen based on sales of those 12 products.

For the reasons set forth above, TWW's motion to exclude and strike opinions of Dr. Singhose on certain specific product numbers (and corresponding damages calculations from Mr. Olsen) should be denied.

Dated: November 19, 2021                    Respectfully submitted,

*s/ R. Braxton Hill, IV*
R. Braxton Hill, IV (VSB 41539)
Michael W. Smith (VSB 01125)
CHRISTIAN & BARTON LLP
901 East Cary Street, Suite 1800
Richmond, Virginia 23219
(804) 697-4108
bhill@cblaw.com
msmith@cblaw.com

John W. Harbin (pro hac vice)
David S. Moreland (pro hac vice)
Gregory S. Carlin (pro hac vice)
Warren J. Thomas (pro hac vice)
Steven M. Philbin (pro hac vice)
Meunier Carlin & Curfman LLC

---

[10] Dr. Stevick does not otherwise offer any opinions about the incongruence of Singhose physically examining products Stevick "understand[s]" were not sold in the U.S. See ECF No. 163-2 ¶¶ 25–27.

>999 Peachtree Street NE, Suite 1300
>Atlanta, Georgia 30309
>(404) 645-7700
>jharbin@mcciplaw.com
>dmoreland@mcciplaw.com
>gcarlin@mcciplaw.com
>wthomas@mcciplaw.com
>sphilbin@mcciplaw.com
>
>*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 19th day of November 2021, I electronically filed the above OPPOSITION TO TWW'S MOTION TO EXCLUDE AND STRIKE with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record:

>*s/ R. Braxton Hill, IV*
>R. Braxton Hill, IV (VSB 41539)